IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| EDDIE RAY JEFFERY,<br>        Plaintiff, | §<br>§<br>§ |
| v. | §<br>§ |
| | § CIVIL ACTION NO. 600CV205 |
| KATHY VERNON, CARLOYN JOHNSON, KENNETH<br>THOMPSON, CHARLES SPIVEY, CORNELUIS<br>SMITH, ELTON BROCK, MICHAEL UPSHAW,<br>KEVIN MOORE, CHARLES WILLIAMSON, STEVE<br>STAPLES, KATHY MAXEY, LELAND HEUSZEL,<br>JAY MORGAN, BILL LEWIS, J. B. WARREN,<br>PHILLIP BRICKHAM, GARY JOHNSON, BRUCE<br>WHITE, WILLIAM MAYS, JOHN MCAULIFFE,<br>EACH MEMBER OF THE TOCJ-ID DIRECTOR'S<br>REVIEW COMMITTEE, AND EACH MEMBER OF<br>THE TOCJ-ID BUREAU OF CLASSIFICATION<br>COMMITTEE,<br>(In their individual capacity.)<br>                        Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

## CIVIL RIGHTS COMPLAINT

### I.
### INTRODUCTION

This is a § 1983 action filed by plaintiff for violations of his constitutional rights to be free of employment and racial discrimination for association, harassment, retaliation, cruel and unusual punishment to inflict mental anguish, in part of a conspiracy to deprive the equal protection of the laws, or equal privileges and immunities under the laws; and, seeking money damages, declaratory judgement and injunctive relief.

Plaintiff request a trial by jury.

### II.
### JURISDICTION

1. This civil action is filed under the First, Eighth and Fourteenth Amendments to the United States Constitution which are

2

enforceable through Title 42 U.S.C. §§ 1983, 1985(3) and 1986. The court has jurisdiction over these constitutional claims under Title 28 U.S.C. §§ 1331 and 1343(3)(4).

Plaintiff invokes pendent jurisdiction of this court.

## III.
## VENUE

2. The Eastern District of Texas is an appropriate venue for this action under Title 28 U.S.C. § 1391(b)(1), because one or more of the defendants reside in this district.

3. The Eastern District of Texas is also an appropriate venue under Title 28 U.S.C. § 1391(b)(2), because initial events giving rise to the claims occurred in this district.

## IV.
## PARTIES

PLAINTIFF:

4. EDDIE RAY JEFFERY (hereinafter "plaintiff") is a state prisoner incarcerated at the Texas Department of Criminal Justice -Institutional Division (hereinafter referred to as the TDCJ-ID), Ellis Unit, Route 6, Huntsville, Texas, 77343.

DEFENDANTS:

5. KATHY VERNON (hereinafter "Ms Vernon") is employed as a correctional officer at the TDCJ-ID Coffield Unit, Route 1, Post Office Box 150, Tennessee Colony, Texas, 75884. At all times relevant to this action, Ms Vernon is assigned to the 6AM to 2PM or 4AM to 12PM shift of security/correctional personnel.  She is sued in her individual capacity.

6. CARLOYN JOHNSON (hereinafter "Ms Johnson") is employed as a correctional officer at the TDCJ-ID Coffield Unit, Route 1,

3

Post Office Box 150, Tennessee Colony, Texas, 75884. At all times relevant to this action, Ms Johnson is assigned to the 6AM to 2PM or 4AM to 12PM shift of security/correctional personnel. She is sued in her individual capacity.

7.  KENNETH THOMPSON (hereinafter "Lt. Thompson") is an employee for the TDCJ-ID Coffield Unit, Route 1, Post Office Box 150, Tennessee Colony, Texas 75884. At all times relevant to this action, Lt. Thompson is a supervisor at the Coffield Unit for the 6AM to 2PM shift of security/correctional personnel.   He is sued in his individual capacity.

8.  CHARLES  SPIVEY (hereinafter  "Capt. Spivey")  is  an employee at the TDCJ-ID Ellis Unit, Route 6, Huntsville, Texas, 77343.   At all times relevant to this action, Capt. Spivey is a supervisor at the Ellis Unit and responsible for the 6AM to 2PM shift of security/correctional  personnel.   He is sued in his individual capacity.

9.  CORNELIUS SMITH[1] (hereinafter  "Maj. Smith")  is  a former Building Major at the TDCJ-ID Coffield Unit and presently employed at the TDCJ-ID Beto Unit, Post Office Box 128, Tennessee Colony, Texas, 75880. At all times revelant to this action, Maj. Smith is responsible for the  supervision and training of the security/correctional personnel at the Coffield Unit.   He is sued in his individual capacity.

10.  ELTON  BROCK  (hereinafter  "Maj. Brock")  is a former

----

1).  On information and belief, Maj. Smith was demoted to the rank of Captain and transferred to TDCJ-ID Beto Unit for violations of an inmate's civil rights.

Building Major at the TDCJ-ID Ellis Unit, Route 6, Huntsville, Texas, 77343. At all times relevant to this action, Maj. Brook building major and responsible for the supervision and training of the security/correctional personnel at the Ellis Unit. He is sued in his individual capacity.

11. MICHAEL UPSHAW (hereinafter "Warden Upshaw") is an Assistant Warden at TDCJ-ID Coffield Unit, Route 1, Post Office Box 150, Tennessee Colony, Texas, 75884. At all times relevant to this action, Warden Upshaw is responsible for the management and control, training and supervision of the security/correctional personnel at the Coffield Unit. He is sued in his individual capacity.

12. KEVIN MOORE (hereinafter "Warden Moore") is Assistant Warden at TDCJ-ID Coffield Unit, Route 1, Post Office Box 150, Tennessee Colony, Texas, 75884. At all times relevant to this action, Warden Moore is responsible for management and control, training and supervision of the security/correctional personnel at the Coffield Unit. He is sued in his individual capacity.

13. CHARLES WILLIAMSON (hereinafter "Warden Williamson") is a former Assistant Warden at TDCJ-ID Ellis Unit, and presently Assistant Warden at the TDCJ-ID Eastham Unit, Post Office Box 15, Lovelady, Texas, 75851. At all times relevant to this action, Warden Williamson is responsible for the management and control, training and supervision of the security/correctional personnel at the Ellis Unit. He is sued in his individual capacity.

14. STEVE STAPLES (hereinafter "Warden Staples") is a former Assistant Warden at the TDCJ-ID Ellis Unit, and presently

Assistant Warden at TDCJ-ID Ferguson Unit, 12120 Salvage Drive, Midway, Texas, 75852.  At all times relevant to this action, Warden Staples  is responsible for the management and control, training and supervision of the security/correctional personnel at the Ellis Unit. He is sued in his individual capacity.

15.  KATHY MAXEY (hereinafter "Ms Maxey") is former Chief of The Unit Classification Committee at the TDCJ-ID Ellis Unit, Route 1, Huntsville, Texas, 77343. At all times relevant to this action, Ms Maxey is responsible for the management, control and execution of the classification plan at the Ellis Unit.  She is sued in her individual capacity.

16.  LELAND  HEUSZEL  (hereinafter "Warden Heuszel") is a former Assistant Warden at  TDCJ-ID  Ellis Unit, and presently Assistant Warden at the TDCJ-ID Duncan Unit, 1502 So. 1st Street, Diboll, Texas,  75941.  At all times relevant to this action, Warden Heuszel is responsible for the  management and control, training and supervision of the security/correctional personnel at the Ellis Unit. He is sued in his individual capacity.

17.  JAY MORGAN (hereinafter "Warden Morgan") is the Senior Warden at TDCJ-ID Ellis Unit, Route 8, Huntsville, Texas, 77343. At all times relevant to this action, Warden Morgan is ultimately responsible for management and control, training and supervision of the security/correctional personnel at the Ellis Unit. He is sued in his individual capacity.

18.  BILL LEWIS (hereinafter  "Mr. Lewis") is the TDCJ-ID Regional I Director, Post Office Box 99, Huntsville, Texas 77342. At all times relevant to this action, Mr. Lewis is responsible

for overseeing management and control, training and supervision of the TDCJ-ID Units in the Regional I area. He is sued in his individual capacity.

19.  J. B. WARREN (hereinafter "Mr. Warren") is a TDCJ-ID Regional 2 Director, Postal Drawer 400, Tennessee Colony, Texas, 75861. At all times relevant to this action, Mr. Warren is responsible for overseeing management and control, training and supervision of the TDCJ-ID Units in the Region 2 area. He is sued in his individual capacity.

20.  PHILLIP BRICKHAM (hereinafter "Mr. Brickham") is a TDCJ-ID Regional 2 Director, Postal Drawer 400, Tennessee Colony, Texas, 75861. At all times relevant to this action, Mr. Brickham is responsible for overseeing management and control, training and supervision of the TDCJ-ID Units in the Region 2 area. He is sued in his individual capacity.

21.  GARY JOHNSON (hereinafter "Mr. Johnson") is TDCJ-ID Administrative Director, Post Office Box 99, Huntsville, Texas, 77342. At all times relevant to this action, Mr. Johnson is ultimately responsible for the management and control, training and supervision of the TDCJ-ID employees and enforcing statutory laws, court orders, institutional policies and procedures, etc., which governs the TDCJ-ID. He is sued in his individual capacity.

22.  BRUCE WHITE (hereinafter "Lt. White") is an employee for the TDCJ-ID Internal Affairs Division (IAD) at the TDCJ-ID Coffield Unit, Route 1, Post Office Box 150, Tennessee Colony, Texas, 75884. At all times relevant to this action, Lt. White is an IAD investigator and responsible for providing inquiries into

allegations of misconduct on the part of any TDCJ employee and criminal violations on state property controlled by the TDCJ. He is sued in his individual capacity.

23. WILLIAM Mays (hereinafter "Lt. Mays") is an employee for the TDCJ-ID Internal Affairs Division at TDCJ-ID Coffield Unit, Route 1, Post Office Box 150, Tennessee Colony, Texas, 75884. At all times relevant to this action, Lt. Mays is an IAD investigator and responsible for providing inquiries into allegations of misconduct on the part of any TDCJ employee and criminal violations on state property controlled by the TDCJ. He is sued in his individual capacity.

24. JOHN MCAULIFFE (hereinafter "Mr. McAuliffe") is the former Director for the TDCJ-ID Internal Affairs Division, Post Office Box 99, Huntsville, Texas, 77342. At all times relevant to this action, Mr. McAuliffe is ultimately responsible for the management and control, training and supervision of the personnel in the IAD and providing inquiries into allegations of misconduct on the part of any TDCJ employee and criminal violations on state property controlled by the TDCJ. He is sued in his individual capacity.

25. EACH MEMBER OF THE TDCJ-ID DIRECTOR'S REVIEW COMMITTEE (hereinafter "the DRC"), Post Office Box 99, Huntsville, Texas, 77342. At all times relevant to this action, the DRC is solely responsible for reviewing and resolving any public complaint(s) against TDCJ-ID employee for failure to comply with established departmental guidelines, policies or procedures. Each member is sued in his/her individual capacity.[2]

8

26.   EACH   MEMBER   OF   THE   TDCJ-ID   BUREAU   OF   CLASSIFICATION COMMITTEE (hereinafter "the BOC"), Post Office Box 99, Huntsville Texas, 77342.   At all times relevant to this action, the BOC is ultimately responsible for the separation and classification of inmates according to his/her sex, age, corrigibility, conduct, obedience, industry and criminal history, and type of offense for which the inmate was sentenced to the TDCJ-ID.   Each member is sued in his/her individual capacity.[2]

27.   At all times relevant to this action, the defendants have acted under color of state law.

## V.
## FACTS

28.   Plaintiff asserts, the allegations of this complaint consist of continuous events arising over a period of years which results in the undue suffering of mental and emotional anguish.

29.   In July, 1989, to February, 1991, Andrea Nicole Jock (hereinafter "Andrea") was employed at the TDCJ-ID Ellis Unit.

30.   In May, 1991, Andrea began to share a correspondence relationship with plaintiff at the TDCJ-ID Huntsville/Wells Unit.

31.   Plaintiff complied with the TDCJ-ID Inmate Visitation Policy[3] (hereinafter referred to as "AD-03.85") and submitted the

_____

2).   In a motion for disclosure, plaintiff shall seek the name of these defendents for service of process.

3).   The TDCJ-ID Inmate Visitation Plan is implemented pursuant to the provisions of Texas Government Code Ann., §§ 500.010, 500.011 and 500.012;  Texas Penal Code, § 20.02(d); and,   The Stipulation Modifying The Crowding Provisions of Amended Decree, Ruiz v. Johnson, Civil Action No.  H-78-987-CA, May, 1985.

9

required form for approval of Andrea on the Visitors List.

32. At the time, plaintiff seldom received visits from the relatives and friends already approved on the Visitors List.

33. On or about 17 June 1991, the SOC approved Andrea as a "FRIEND" for non-contact visits on the Visitors List.

34. Afterwards, Andrea visited plaintiff each weekend.

35. The weekly visits and daily correspondence intensified the relationship between plaintiff and Andrea.

36. Plaintiff requested an interview with the unit warden for the approval of "special contact visits" with Andrea.[4]

37. In a response to the request, the warden's secretary, Ms. Molly Standley, conducted an interview with plaintiff.

38. Ms. Standley suggested common-law marriage as being the simplest solution for plaintiff and Andrea to have contact visits.[5]

39. As encouragement, Ms. Standley provided information of the legal requirements for the SOC to acknowledge a common-law marriage for contact visitation.

---

4). "The unit warden or his/her designee may permit special visits (contact or non-contact) or authorize special conditions of visits outside of the ordinary course of the established visitation rules. The warden may delegate authority to review and approve special visits to a designee to include the Assistant Warden, Building Major, or the Unit Classification Committee. Inmates wanting to have a special visit shall submit requests in writing to the unit warden." AO-03.85, Section IV, page 18.

5). "Spouse (common-law or ceremonial). The person listed as an inmate's spouse on the inmate's Visitors List shall be eligible for contact visits. . . ." AO-03.85, Section II(E)(1)(e), page 15.

40.   On 10 July 1991, Ms. Standley notarized a "Declaration of Informal Marriage and Supporting Affidavit"[6] to bind plaintiff in a common-law marriage with Andrea.

41.   In addition, Ms. Standley accepted a "Declaration for Informal Marriage and Supporting Affidavit"[6] to bind Andrea in a common-law marriage with plaintiff.

42.   On information and belief, Ms. Standley hand-delivered the acceptable documents to the SOC.

43.   On 10 July 1991, the SOC changed the visiting status on the Visitors List for Andrea from "FRIEND" to "COMMON-LAW WIFE."

44.   On 16 July 1991, according to the change request, the SOC changed Andrea's name on the list to "Andrea Nicole Jeffery."

45.   Several weekends, at the Huntsville/Walls Unit, during contact visits, plaintiff and Andrea were criticized, harassed, and discriminated against by TDCJ-ID officials for sharing an interracial relationship.[7]

46.   The most notable incident occurred when Andrea was detained for over an hour while plaintiff awaited her arrival.

47.   Finally, when cleared to visit, Andrea and plaintiff

---

6).   ". . .documentation for establishing a common-law marriage status is a declaration of informal marriage. A declaration of informal marriage shall be executed on a form prescribed by the Bureau of Vital Statistics for the State Department of Health and provided by the County Clerk. After verification, the SOC will be notified via receipt of a copy of the documentation along with the inmate's change request. A copy of the document(s) shall be placed in the inmate's unit files." AD-03.85, Section II(E)(1)(e), page 15.

7).   Plaintiff is an African-American male.
      Andrea is a White-American female.

were immediately harassed, humiliated and falsely accused by a correctional officer in the presence of other inmates and their visitors.

48. A number of ranking officers were summoned to the visitation area to investigate the false accusations.

49. The accusations were without merits and the summon of those officers proved to be in bad faith.

50. During the remainder of their visit, plaintiff and Andrea were devastated and in a state of intimidation.

51. At the conclusion of visitation, plaintiff confronted the correctional officers and requested their names to execute an administrative grievance.

52. The lieutenant-in-charge became very belligerent and threatened to have plaintiff's contact visits suspended.

53. In light of no evidence to support or justify the suspension of plaintiff's contact visits, the lieutenant ordered a group of correctional officers to search plaintiff's housing area for contraband.

54. The search produced a broken state-issue razor which the officers classified as contraband.

55. Plaintiff was charged with a major disciplinary case for the "Possession of Contraband."

56. At a disciplinary hearing, plaintiff was found guilty and punishment was assessed at demotion from a State Approved Trusty III to Line Class I, forfeit of accredited good conduct time and several hours of extra duty.

57. At the time, contact visitation was reserved for those

inmates with a State Approved Trusty status.[8]

58. On information and belief, a demotion in class status (from State Approved Trusty III to Line Class I) was to fulfill the desire of the lieutenant.

59. Plaintiff filed a complaint to the IAD which resulted in harsh retaliation.

60. On 12 October 1991, the most significant retaliatory action occurred, when plaintiff was dropped from participation in the four-year college program and transferred by the BOC to the TDCJ-ID Ellis Unit.[9]

61. The first weekend of the transfer, Andrea visited with plaintiff on the Ellis Unit.

62. The next weekend, plaintiff was not informed, Andrea's attempt to visit was denied without reason or rule infraction.[10]

---

8). "Inmates who are eligible for contact visits and who are found guilty of disciplinary violations (or major reduced to minor) by a disciplinary hearing officer through a major disciplinary hearing process may have their contact visitation privileges suspended for a minimum of one visit and a maximum of four months from the date of conviction. The suspension of contact visits need not be assessed by a disciplinary hearing officer in those cases where inmates are demoted to a time-earning status below State Approved Trusty IV as punishment for a major disciplinary violations. These inmates are automatically ineligible for contact visits until such time they again satisfy the eligibility criteria. . . . " AD-03.85, Section II(F)(1)(2), page 17.

9). Plaintiff is a four-year college participant, and it was alleged the transfer to the Huntsville/Walls Unit was for enrollment into the four-year college program, although the same program was available on the Ellis Unit from where plaintiff was transferred.

10). "1. When there is reason to believe a forthcoming visit and/or a particular visitor will compromise the safety and security of inmates, staff or the institution, the unit

63.   On 29 October 1991, the BOC removed Andrea from the Visitors List and placed her name on plaintiff's negative mailing list "Per recommendation of the Ellis Unit Administration and the approval of the State Classification Committee for attempting to circumvent TDCJ Correspondence Rules."

64.   Plaintiff was unaware of the accusations, and was not disciplined for any type of action related to ". . .attempting to circumvent the TDCJ Correspondence Rules."

65.   On 05 September 1991, the former Chief of Ellis Unit Classification Committee, Mr. D. Lorimer, response to plaintiff

---

warden  or his designee shall have  the authority to  cancel the visit and/or  deny a particular individual's  permission to visit that day.   In addition, the unit warden may remove an individual's  name from  an inmate's  Visitors List, when there is  cause to believe that the  visitor will compromise the security of the  institution and/or safety of inmates or staff.
2.   The specific  reason(s) for  cancellation of a visit, denial of a visitor and/or  removal of a visitor from an inmate's Visitors  List shall be  documented and filed in the  inmate's  unit  classification  folder  and in the unit folder maintained by the security office. If the decision is made to  remove a visitor's  name from  the Visitors List, a copy of the  documentation shall also  be maintained  in the inmate's central file at the Bureau of Classification.
3.   An inmate  must be notified in writing  of the denial of a visit either before (if  time permits) or immedi- ately after  the cancellation of a visit.   An inmate will also be given written notice upon the removal of a visitor's name from the inmate's  Visitors List.   All written notices to inmates shall include specific reason(s) for the adminis- trative  action taken, except  in instances  when disclosure of the reason to  the inmate would  jeopardize institutional security  and/or the  safety of  any  individual.   (In such cases,  the  reason  can  be  stated  as  follows:  "For the security and  safety of  inmates,  staff and  institution.") (Emphasis.)
4.   An inmate may appeal the decision to remove an individual's  name  from  his/her  Visitors  List  through the Inmate Grievance Procedure."   AD-03.85, Section I (L)(1)(2) (3)(4), page 9.

for removal of Andrea from the Visitors List stated: "Andrea's name was removed from the visitation and mailing lists by the Bureau of Classification based on information from the Ellis I Unit warden Andrea visits will compromise the security of the institution and/or safety of inmates and staff."

65. The discrepancy and lack of evidence to support the accusations for removal of Andrea from the Visitors List caused plaintiff to file a complaint with the IAD.

67. On 26 September 1991, the BOC replaced Andrea on the Visitors List as "FRIEND" for non-contact visits and plaintiff was transferred to the TDCJ-ID Estelle Unit.

68. On or about 15 October 1991, per demand of the Estelle Unit administration and the BOC, plaintiff submitted copies of the original "Declarations of Informal Marriage" as verification for common-law marriage to Andrea.

69. Ninety(90) days had elapsed since plaintiff was found guilty of the disciplinary violation "Possession of Contraband" at the Huntsville/Walls Unit.[11]

70. According to TDCJ-ID Classification Plan, plaintiff was eligible for reclassification, restoration of the loss good time credits and promotion in class and custody status.[12]

_____

11). See paragraphs 54 thru 56, supra.

12). The TDCJ-ID Classification Plan required, "Inmates without any major disciplinary violation within ninety(90) days are eligible for reclassification, a promotion in class and custody status, and restoration of forfeited good time credits."

71. The reclassification of plaintiff would have restored the privilege for contact visits with Andrea and qualified for participation in the four-year college program to achieve a bachelor's degree in psychology.

72. In a request to be recommended for reclassification, plaintiff's immediate supervisors added his name to the list with the names of other inmates for reclassification.

73. The other inmates on the list were reclassified and promoted in class or custody status, and/or restored lost good conduct time; yet, the Unit Classification Committee declined to reclassify plaintiff.

74. On or about 18 November 1991, in response to a request from plaintiff to be recommended for reclassification, the Unit Major conducted an interview.

75. The major "propositioned" plaintiff for recommendation to be reclassified.

76. The "proposition" was for plaintiff to return to his job assignment in the Unit Laundry and gather information related to some inmates plan to escape.

77. For the sole purpose of reclassification, plaintiff performed the dangerous task of enquiring information directly from the inmates involved in the plan to escape.

78. Based on the information, the plan to escape was designed to kidnap the female laundry supervisor.

79. There were no doubts in plaintiff's belief the kidnap of the female supervisor would not cause her to suffer the grief of physical injury and/or sexual assaults.

16

80. Being familiar with the inmates, plaintiff assumed the kidnap of the female supervisor could easily result in her death.

81. Plaintiff located the route to be used in the escape, and the whereabouts of bolt-cutters, car keys, cash money, dyed tennis shoes, officer clothing, and an alleged forty-five(45) automatic weapon to effectuate the escape.

82. On or about 19 November 1991, plaintiff relayed to the Unit Major the information acquired of the plan to escape.

83. The information proved to be fruitful and productive, however, the major balked on the agreement to have plaintiff reclassified.

84. As a result of gathering the information, and possibly saving the hardship of a female correctional officer, plaintiff was placed in punitive segregation without a hearing, notice or charge of any disciplinary or criminal violation(s).

85. In punitive segregation, plaintiff was denied clothing (except underwear), bed linen, pillow and/or blanket.

86. Plaintiff was denied possession of personal property and legal material, incoming and outgoing correspondence, visits, and access to the courts and public officials.

87. Plaintiff was subjected to sexual harassment at the whim of two(2) female correctional officers in the presence of male correctional officers.

88. Plaintiff was unable - and prison officials declined - to inform Andrea plaintiff was confined in punitive segregation.

89. Andrea drove over one-hundred-thirty(130) miles for a visit with plaintiff, which was denied by the unit administration

failure to comply with the AD-03.85.[13]

90.  In an interview with the unit warden, major and IAD investigators, plaintiff was interrogated on the information of the inmates' plan to escape.

91.  At the interview, plaintiff complained about the conditions of being confined in punitive segregation and was assured the situation would be rectified; however, no such action was taken.

92.  A ranking officer informed plaintiff that Andres made numerous phone calls - several times daily - "worrying" the unit administration.

93.  The ranking officer stated Andres was highly upset and in an uproar. . .something was happening and she was not receiving any mail from plaintiff.

94.  According to the ranking officer, Andres threatened to appeal to higher authority for being denied communications with plaintiff.

95.  On 10-11 December 1991, after the elapse of twenty-one (21) days in punitive segregation, plaintiff was transferred from TDCJ-ID Estelle Unit to the TDCJ-ID Hughes Unit in Gatesville, Texas.[14]

96.  On the day of plaintiff's arrival, the Hughes Unit Classification Committee questioned plaintiff on a report which

_____

13).  See Note 10, supra.

14).  On information and belief, Andres's consistent phone calls of concern prompted Estelle Unit administration and the BCC to transfer plaintiff.

implicated plaintiff in the actual plan to escape at the Estelle Unit.

97. The Hughes Unit Classification Committee was baffled by the report which alleged plaintiff a participant in the plan to escape without punishment of disciplinary or criminal action.

98. Plaintiff explained to the committee the facts as it occurred and was restored loss good time credits and promoted in class and custody status.

99. Andrea was allowed to visit plaintiff each weekend on the Hughes Unit without difficulty.[15]

100. Plaintiff registered for enrollment in the four-year college program offered by Tarleton State University;[16] however, prior to being scheduled for classes, plaintiff filed a complaint

_____

15). Once in 1992, the BOC arbitrarily removed Andrea's name from the Visitors List. When Andrea inquired, a member of BOC alleged there was documented information plaintiff requested for her name to be removed from the list. The so-called "documented information" is false and plaintiff, at no time, made the request. The BOC required plaintiff to submit a formal change request for Andrea to be replaced on the Visitors List.

Plaintiff submitted for the change and Andrea was replaced on the list as "FRIEND" for non-contact visits.

The BOC demanded for plaintiff to submit a copy of the "Declarations of Informal Marriage" verified by a County Clerk with a request for change.

On 26 March 1992, the clerk for Henderson County, Texas, Ms. Gwen Moffiet, stamped copies of the "Declarations of Informal Marriage" and filed same with the Bureau of Vital Statistics of the State Health Department in Case Nos. 3631 and 3632, Volume 1401, Pages 799, 800-801.

Duplicates of the documents were submitted to the BOC. Andrea's visiting status was changed from "FRIEND" to "COMMON-LAW WIFE" on the Visitors List for contact visits.

16). At the time, TDCJ-ID offered a four-year college program at the Hughes Unit, sponsored by Tarleton State University; at the Huntsville/Wells, Ellis and Wynne Units,

with the IAD against the warden and other TDCJ-ID employees for "Gambling on State Property."

101.   On 12-13 April 1992, plaintiff was transferred by the BOC and Hughes Unit Administration to the TDCJ-ID Bill Clements Unit in Amarillo, Texas.

102.   On information and belief, the transfer was the result of plaintiff filing the "Gambling on State Property" complaint.

103.   The Clements Unit does not have a four-year college program and the distance of the transfer required Andres to visit plaintiff via air travel.

104.   Each college semester, in response to college transfer requests,[17] TDCJ-ID Department of Continuing Education approved and recommended plaintiff and several other inmates for a college transfer.

105.   The BOC denied plaintiff a college transfer, and transferred all the other inmates, approved and recommended by the Department of Continuing Education, to a TDCJ-ID unit with a four-year college program.

106.   Plaintiff concentrated to resolve legal issues raised on previous unit of assignments, and assisted other inmates in legal activities.

---

sponsored by Sam Houston State University; at the Coffield Unit, sponsored by Stephen F. Austin University; and, at the Ramsey I Unit, sponsored by the University of Houston at Clear Lake.

17).   The "TDCJ-ID College Program Transfer Request For A Four-Year Degree" is a form for qualified inmate students to complete and submit to the Education Department on their unit of assignment.

107. In a singular incident, there was a rumor plaintiff would be killed for assisting an inmate in filing a complaint against a ranking correctional officer.

108. Plaintiff was aware of the threat, but the source of its origin was not revealed.

109. The attempt on plaintiff's life resulted in plaintiff sustaining a broken jaw and bruises.

110. In effect, plaintiff was charged with the disciplinary violation "Fighting without a weapon" and placed in detention, when, in fact, plaintiff was the victim of the assault.

111. The assaultive inmate remained in general population without being charged with [any] disciplinary violation(s).

112. Plaintiff was denied medical attention for a broken jaw and the endurance of physical pain and mental anguish lasted for 2½ days, before the unit law library supervisor intervened and demanded plaintiff be given medical treatment.

113. In relation to the "Fighting without a weapon" charge, plaintiff was also charged with the false disciplinary violations of "Threatening an inmate" and "Out of place."

114. At the disciplinary hearing, plaintiff was found guilty of each charge and punishment was assessed at fifteen(15) days disciplinary segregation, reduction in class status and loss of good time credits.

115. At the time, Andrea constantly complained to the unit administration and her calls were transferred to plaintiff's former casemanager, Ms. Linda Sanders.

116. Ms. Sanders relayed false and deceptive information to

Andrea concerning plaintiff's health and subsequent conditions.

117.  On or about 16 September 1992, the Bill Clements Unit Administration and the SOC transferred plaintiff to the TDCJ-ID Michael Unit in Tennessee Colony, Texas.

118.  On information and belief, the transfer was a result of Andrea and plaintiff's complains and appeals to TDCJ officials about the incriminating and false allegations of institutional violations and request for criminal prosecution of the inmate for assaulting plaintiff.

119.  Andrea visited plaintiff each weekend at the Michael Unit and plaintiff resumed assisting other inmates in their legal activities; rarely, participating in any action to challenge the prison conditions on the Michael Unit.

120.  Plaintiff was reclassified (on schedule - after the elapse of ninety(90) days) and promoted in class status with the restoration of loss good time credits forfeited by Bill Clements Unit Disciplinary Committee.

121.  The reclassification of plaintiff restored eligibility for participation in the four-year college program and contact visitation with Andrea.

122.  At the time, plaintiff was receiving an annual Federal Pell Grant to pay college tuition.

123.  The Department of Continuing Education approved and recommended plaintiff and other inmates for college transfers to a TDCJ-ID Unit with a four-year college program.

124.  The SOC declined to transfer plaintiff for college and ransferred all the other inmates to the unit of choice on their

college transfer request.

125. Plaintiff's weekly visits with Andrea were monitored and frowned upon by various Michael Unit correctional officers.

126. In a notable instance, a correctional officer would take home plaintiff's correspondings from Andrea and return the following evening to execute delivery to plaintiff.

127. At the conclusion of a visit with Andrea, plaintiff's endurance of harassment, from correctional officers, was at its highest level.

128. A recorded incident stem from plaintiff being denied to make commissary purchases by an officer previously assigned to the visitation area.

129. The correctional officer pat-searched plaintiff and the pictures of Andrea were taken from plaintiff's wallet, thrown to the floor, kicked and stomped by the officer.

130. On an indication plaintiff would file a grievance, the officer ordered and ushered plaintiff to the area designed for outside recreation.

131. Outside, and under the watchful eyes of a supervisor, the officer made verval threats and attempts to provoke plaintiff into a fist-fight. Plaintiff's declination to rebel resulted in verbal abuse and a physical assault on plaintiff's person.

132. When a formal resolution failed, plaintiff filed a written complaint to the IAD on the officer and his supervisor. [18]

_____

(18). To the date of filing this action, plaintiff has not received any reply from the IAD.

23

133.   On 14 January 1993, the Michael Unit Administration and the BOC transferred plaintiff to the TDCJ-ID McConnell Unit in Beeville, Texas.

134.   On information and belief, plaintiff's transfer was the retaliatory result of filing the complaint to IAD.

135.   Each time plaintiff was transferred, a report bearing false, discriminatory and/or deceptive information was made apart of plaintiff's classification records.

136.   The adverse information was designed to bias decisions of Unit Classification Committees evaluating plaintiff for unit assignments.

137.   The McConnell Unit does not have a four-year college program; however, each semester plaintiff continued to submit a college transfer request.

138.   The college transfer would be approved and recommended by the Department of Continuing Education, but denied by the BOC.

139.   At the McConnell Unit, plaintiff pursued legal issued and filed inmate grievances and complaints to challenge the abuse of authority, practices and living conditions on the McConnell Unit which were contrary to state and federal guidelines.

140.   Plaintiff had an acknowledgeable reputation among the correctional officials and inmates as being a "writ-writer."[19]

---

19).   An inmate is labelled a "writ-writer" by prison officials for filing grievances or litigations to challenge the abusive authority of prison officials for violations of institutional policies, inmates' civil and/or constitutional rights, and the statutory requirements under the state and federal guidelines.

141.  When a correctional officer filed a complaint against a supervisor, which alleged affiliations with inmate gang-related activities, it was rumored plaintiff filed the complaint.

142.  On information and belief, the complaint resulted in several job assignments being changed for those inmates under the direct supervision of the complained of supervisor.

143.  According to a lieutenant,[20] the unit administration received information a contract was issued on plaintiff's life for the rumor alleging that plaintiff filed the complaint against the supervisor.

144.  The lieutenant gave orders for plaintiff to be placed in transient or protective custody.

145.  On 25 May 1993, at approximately 11:30PM, plaintiff's personal property and legal material was confiscated by several correctional officers.

146.  On 26 May 1993, plaintiff was escorted to an outgoing chain bus [21] to be transferred.

147.  Opposed to the TDCJ-ID administrative policies and procedures for transferring inmate, plaintiff was not allowed to carry his personal property and legal material aboard the bus.

148.  A verbal request for the names of the correctional

---

20).  The lieutenant was responsible for the false and arbitrary disciplinary action against plaintiff on the Bill Clements Unit. (See PARAGRAPHS 112-113).  On information and belief, the lieutenant was promoted to the rank of captain and transferred to the McConnell Unit.

21).  A bus designed for inter-unit transportation of TDCJ-ID inmates.

officers responsible for denying plaintiff's personal   property
and legal material resulted in plaintiff being violently forced
to the ground and shackled with leg irons and handcuffs.

149.  In addition, a piece of steel chain was secured to run
through the leg irons and handcuffs which forced plaintiff into a
stooped position with his head less than a foot from his knees.

150.  Aboard the bus, plaintiff was placed in the restricted
section reserved for inmates on administrative segregation.

151.  The restraints forced plaintiff into a cruel position,
producing a physical pain, mental strain and refraining plaintiff
from standing erect to relieve  his bladder, during many hours of
travel from the McConnell Unit in Beeville, Texas, to the TDCJ-ID
Darrington Unit in Rosharon, Texas.

152.  Plaintiff's verbal requests for lesser restraint were
only humor to the correctional officers on the bus.

153.  On or about 27 May 1993, the BOC transferred plaintiff
from Darrington Unit to  the  Huntsville/Wells Unit in Huntsville,
Texas.

154.  At the Huntsville/Wells Unit, plaintiff was placed in
security detention for complaining about his personal  property
and legal material.

155.  On or about 01 June 1993, plaintiff was transferred,
by the BOC, from the Huntsville/Wells Unit to the TDCJ-ID French
Robinson Unit in Abilene, Texas.

156.  The French Robinson Unit does not sponsor a four-year
college program; however, the Department for Continuing Education
approved a previous application and recommended plaintiff for a

college transfer.  [The transfer was denied by the SOC.]

157.  Andrea contacted Ms. Gloria Oates of the Department of Continuing Education and inquired into the arbitrary and discriminatory denial of plaintiff to participate in the advance college programs.

158.  Plaintiff filed grievances, wrote letters to TDCJ-ID Regional Directors and was interviewed by unit wardens to contest the discriminatory denial of a college transfer.

159.  In an indepth correspondence to Carol S. Vance, former Chairman of Texas Board of Criminal Justice, plaintiff explained, explicitly, the endurance of harassment, discrimination, verbal threats and physical assaults in retaliation for participating in legal activities.

160.  The  correspondence contained information of how the SOC arbitrarily discriminated against plaintiff by denying the approval and recommendation for a college transfer.

161.  On or about 02 July 1993, plaintiff's correspondence was forwarded  by Susan Power-Mohenry, Administrative Assistant to the Chairman, to Wayne Scott, former Director of Operations for the TDCJ-ID.

162.  Ms. Power-Mohenry instructed Mr. Scott accordingly:

> "Dear Wayne: The attached correspondence was received in
> the Austin office.  Please review and handle appropriately."

163.  On 20 July 1993, Mr. Scott forwarded the information received from Ms. Power-McHenry to Marshall Herklotz, the former TDCJ-ID Regional II Director, with instructions, as follows:

> "Please, have a member of your  staff interview inmate
> Eddie Jeffery, #376862, in reference to the attached letter."

164. On 13 August 1993, Ms. June Groom, a former Regional II TDCJ-ID Assistant Director, forwarded to the Robinson Unit former senior warden, Ronald Drewery, the information received from Mr. Herklotz.

165. Ms. Groom instructed Mr. Drewery accordingly:

"The attached is being forwarded to you for your review and action. Please, return the attached information along with your response to this office no later than 9-10-93."

166. Although the instruction to Mr. Drewery were precise, the results were to no avail. The unit administration and the BOC continuously denied plaintiff a college transfer.

167. On or about 26 December 1993, an inmate was brutally murdered in his housing on the French Robinson Unit.

168. Initially, the cause of death was considered suicide - before the body was examined and revealed foul-play.

169. Rumors and conflictions surrounding the inmate's death confused the IAD and local state officials.

170. The confusion tied the hands of authority, as the news media and family members screamed for apprehension of the silent perpetrator(s).

171. The news media and family members' concern escalated and the TDCJ-ID officials were unable to locate a suspect and/or produce a motive for the murder.

172. At the time, plaintiff was providing legal assistance to another inmate.

173. The inmate was under an "official watch" for allegedly being a party to the murder offense.

174. The act of providing legal assistance for the inmate

placed plaintiff under "official watch" and questioning about his legal assistance.

175.  In an interview with the senior warden,  Mr. Ronald Drewery, and the IAO, Capt. Brady, plaintiff was recruited in a "proposition" to assist in exposing the inmate(s) responsible for the murder.

176.  The  "proposition"  for plaintiff's assistance was a transfer to a unit offering the four-year college program.

177.  Plaintiff agreed and provided Capt. Brady with a tape recorded confession from the inmate suspected of committing the murder.

178.  The TOCJ-ID Units offering a four-year college program were hundreds of miles closer to Andrea, as opposed to units the BOC seemed to enjoy transferring plaintiff.

179.  The possibility of a pending transfer for college was a relief to plaintiff and Andrea.

180.  On information and belief, plaintiff and Andrea were in mutual agreement the BOC transferred plaintiff farther away from Andrea strictly to inflict mental and emotional tension. . . factors typically resulting into the resolution of a marriage.

181.  Andrea made a phone call to the BOC and inquired about plaintiff's pending transfer.

182.  In a rude response, a member of BOC informed Andrea that plaintiff "would not be transferred anywhere close."

183.  On 22 June 1994, true to words of the BOC spokesman, plaintiff was transferred hundreds of miles away, from the French Robinson Unit to TOCJ-ID Bill Clements Unit in Amarillo, Texas.

184. As previously mentioned, the Bill Clements Unit does not have a four-year college program.

185. At the Bill Clements Unit, plaintiff became helpful to other inmates in their legal activities and challenged conditions and situations on the unit.

186. Plaintiff's action required strenuous legal research and information held by the unit administrative personnel.

187. The information was accessible to inmates under Texas Open Records Act, by request to the unit custodian of records, Ms. Sanders.[22]

188. Ms. Sanders became very impressed with plaintiff's awareness/knowledge of law and sought [personal] legal assistance in an alleged criminal appeal.[23]

189. Plaintiff provided the assistance and complained of the act to the IAD.

190. The IAD did not take immediate action, but insisted plaintiff would be transferred to a unit offering a four-year college program for cooperating to "bust" Ms. Sanders.

191. Plaintiff agreed, and the IAD findings resulted in the termination of Ms. Sanders' employment with the TDCJ-ID.

192. On 15-16 February 1995, plaintiff was transferred by the Bill Clements Unit administration to TDCJ-ID Coffield Unit in

_____

[22]. Ms. Sanders was plaintiff's former casemanager on the Bill Clements Unit. (See paragraphs 115-116.)

[23]. This type of binding relationship between a TDCJ employee and inmate is strongly prohibited under a policy of the TDCJ Employees General Rules of Conduct.

Tennessee Colony, Texas.

193.  Plaintiff's sole desire was to complete the curriculum for a Bachelor degree and enroll into the Master program.

194.  Thus, each semester (since 1991), plaintiff submitted a college transfer request to TDCJ-ID Department of Continuing Education to participate in the four-year college program.

195.  Plaintiff's primary choice for a four-year college degree was Stephen F. Austin University at the Coffield Unit.

196.  At the time of plaintiff's arrival, Stephen F. Austin University was in the process of cancelling its TDCJ-ID program.

197.  In light of this, plaintiff submitted an additional college transfer request to attend Sam Houston State University; however, the SOC continued to deny plaintiff's approved transfer.

198.  Plaintiff filed grievances, endured hunger strikes and complained in written correspondence to the office of the TDCJ-ID Regional Directors and Texas Department of Criminal Justice for redress of the discriminatory denial of a college transfer.

199.  Plaintiff's grievances for redress were denied and the hunger strike at the Coffield Unit was to no avail.

200.  In a response to plaintiff's correspondence to the office of the Regional Directors, Mr. Brickham stated:

> "Your exhaustive recantation of your incarceration and diligent pursuit of educational opportunities has been reviewed. While you may review your transfers as retaliatory and discriminatory in nature, the reason for this is to protect you during your incarceration. No action. . ."

201.  On 16 April 1996, the SOC's blatant response on a copy of the college transfer request stated:

> "Enemy on E1 [Ellis Unit] & escape history."

202. Plaintiff was unaware of an "enemy" on the Ellis Unit and the [falsely] alleged "escape history."

203. In response to plaintiff regarding an enemy and escape history, the unit classification committee response stated:

"What are you talking about?"

204. The unit classification record and computed data on plaintiff did not show any enemy or escape history.

205. The SOC constant transfers of plaintiff imposed a heavy burden and a great deal of emotional strain and anxiety on Andrea and plaintiff.

206. Plaintiff and Andrea endured distressing emotions aroused by an impending danger of plaintiff's physical safety and mental state.

207. While at the Coffield Unit, in order to overcome the hardship, plaintiff resigned to study self-educational courses.

208. Andrea supplied personal funds for plaintiff to enroll in a correspondence course for paralegal/legal assistant.

209. Plaintiff refrained from all legal activities and assisting other inmates in actions involving the conditions of prison confinement.

210. Andrea visited plaintiff each weekend at the Coffield Unit, and - as expected - the usual harassment, bias and racism of TDCJ-ID employees were factors to encounter. However, these factors did not escalate until the spring of 1996.

211. It appeared a customary unit practice for Ms. Vernon to operate the computer during weekend visitation.

212. On information and belief, it was during this time

Ms. Vernon became knowledgeable of Andrea's weekly visits with plaintiff, and her (Andrea) former employment with the TDCJ-ID.

213.   The knowledge Ms. Vernon acquired of Andrea's former employment with the TDCJ-ID produced bias toward plaintiff and Andrea - individually and collectively.

214.   On occasions, Ms. Vernon threatened to have Andrea removed from the Visitors List, because of her former employment with the TDCJ-ID.

215.   Ms. Vernon does not have delegated authority to imply, remove, or threaten to have a visitor removed from the Visitors List.

216.   Ms. Vernon threats were harassment to cause distress, and an attempt to weaken Andrea's desire to visit plaintiff.

217.   On 15 May 1996, in an individual instance against plaintiff, Ms. Vernon provoked and encouraged Ms. C. Bowman, an LVN, to override and delete plaintiff's medical restrictions to support a disciplinary violation that was contrary to plaintiff's medical requirements.

218.   On information and belief, when Ms Vernon became aware of Andrea's prospective employment with Correctional Coroporation of America (CCA),[24] she (Ms. Vernon) contacted the CCA Personnel Office and discouraged the company to employ Andrea.

219.   On information and belief, Ms. Vernon informed the CCA Personnel Office that Andrea's husband was an inmate at TDCJ-ID Coffield Unit.

---

24).   The CCA is a private prison facility.

220.   Andrea's original application for employment with the CCA contained the required information concerning her husband's (plaintiff's) incarceration.

221.   The arbitrary and bias discouragement damaged Andrea's opportunity for employment and resulted in the lost of personal funds for the cost of CCA uniforms, tuition for the correctional officers security training, travel and accrued expenses.

222.   On 29 June 1997, when Andrea arrived at the Coffield Unit to visit plaintiff, Ms. Johnson informed  Andrea that her visits with plaintiff were being terminated.[25]

223.   Ms. Johnson stated, ". . .A new rule preclude a former TDCJ employee to visit inmates."

224.   In addition, Ms. Johnson stated, Maj. Smith remembered Andrea from the unit of her former employment, and per  the senior warden ". . .After today, you will no longer be allowed to visit your husband."

225.   Andrea had limited interaction with  Maj. Smith, a supervisor on the TDCJ-ID Ellis Unit, during her (Andrea) former tenure with the TDCJ-ID.[26]

226.   On information and belief, Maj. Smith was present and aware of Andrea's weekly visits with plaintiff at the Coffield Unit for well over two(2) years (February, 1995, to June, 1997).

------------------------------------------

[25].   Ms. Johnson is a colleague of Ms. Vernon.

[26].   When plaintiff was at the TDCJ-ID French  Robinson Unit, Maj. Smith was a building captain  and [well] aware of Andrea's weekly visits with plaintiff, from June, 1993, to the time of his (Maj. Smith's) promotion and transfer to the TDCJ-ID Coffield Unit.

227. Maj. Smith was Family Liaison Officer the weekend Ms. Johnson informed Andrea her visits were being terminated.[27]

228. The statutory requirements and guidelines of the TDCJ does not delegate authority for Ms. Johnson to act as the Family Liaison Officer during inmates' visitation.

229. The action of Ms. Johnson can only be considered to harass and intimidate a visitor.

230. As the family liaison officer, Maj. Smith, declined to discuss the termination of visitation with plaintiff and Andrea.

231. On 06 July 1997, Andrea did not arrive for a visit and plaintiff was upset, agitated and worried.

232. In a correspondence, Andrea notified plaintiff she had contacted the Coffield Unit Administration on July 9, 1997, prior to travelling for a visit, and was informed her name was removed from the Visitors List.

233. On or about 10 July 1997, in an informal request for information on Andrea's visitation status, plaintiff was informed Andrea was no longer on the Visitors List.

234. Plaintiff nor Andrea were given notice of the removal of her from the Visitors List, nor were there any notice of the

_____

[27]. "The director shall designate one employee at each unit to serve as the family liaison officer for the unit. The family liaison officer shall facilitate the maintenance of ties between inmates and their families for the purpose of reducing recidivism. Each family liaison officer shall . . .

(3)   Assist inmates' relatives and other persons during their visits with inmates and aid those persons in resolving problems that may effect permitted contact with inmates." (V.T.C.A. Government Code, § 500.012).

"specific reason(s) for the administrative action."[28]

235.  On 11 July 1997, plaintiff confronted Warden Upshaw to inquire about the removal of Andrea from the Visitors List.

236.  Warden Upshaw vehemently  and maliciously exclaimed, "We don't hire employees to fall in love with convicts!"

237.  Plaintiff informed Warden Upshaw of the administrative failure to provide notice of the specific reason(s) for removal of Andrea from the Visitors List.

238.  Warden Upshaw replied,  "You'll be notified!" with a shoo-shoo hand gesture for plaintiff to depart.

239.  In retrospect, plaintiff and Andrea were denied merits to appeal the administrative decision.

240.  At the time, plaintiff was working as Support Service Inmate (SSI) Housing Orderly approved by the Unit Classification Committee.[29]

241.  As a result of being ". . .married to a former TDCJ-ID employee," Lt. Thompson repeatedly had plaintiff's job assignment changed.

242.  The  job  assignments were changed for plaintiff to perform duties contrary to his medical status or restrictions.

243.  An attempt for informal resolution to Lt. Thompson's

_____

28).  See note 10(3) at page 13,supra.

29).  The Unit Classification Committee must approve an inmate for Support  Service (SSI) assignments to provide the janitorial services in housing areas, buildings  or hallways which provide continuous access to the housing areas. (V.T.C.A.  Government Code,  § 500.001;  Paragraph III(A), RUIZ  Final Judgement;  TDCJ Administrative Directive [AD-04.72 (Rev.1)(June 26,1995)]).

supervisor, Capt. Bostic, was to no avail.

244. Capt. Bostic informed plaintiff, "I must go along with my lieutenant, if he does not like an inmate."

245. Plaintiff confronted Mr. White and Mr. Mays to report the behavior and misconduct of TDCJ-ID employees which violated institutional policies and statutory requirements.

246. Mr. White and Mr. Mays declined to take action, or intervene, by stating, there were no violations of any TDCJ-ID policies or statutory requirements.

247. On 28 July 1997, in a personal correspondence to the DRC, Andrea explained the situation on the Coffield Unit which denied visits with plaintiff.

248. The correspondence expressed Andrea's astonishment at being arbitrarily removed from the Visitors List without incident or rule infraction.

249. Andrea requested DRC replace her on the Visitors List.

250. On 29 July 1997, plaintiff filed a grievance.

251. On 06 August 1997, in response to Andrea's personal correspondence, the DRC stated:

> "Dear Ms. Jeffery;
>
> May this acknowledge receipt of your correspondence to the Director's Review Committee (DRC) requesting reinstatement of visitation privileges with offender Eddie Jeffery, TDCJ#: 376862, Coffield Unit.
> Your letter was read by each committee member. However, after careful review and consideration, it was the decision of the committee with the unit warden approval, to not grant your request; your name will not be added to the list of approved visitors for offender Jeffery. This decision may be appealed after six months have elapsed."

252. On 06 August 1997, prior to a response from the DRC, Andrea submitted a lengthy complaint to the DRC expressing the

failure of TDCJ-ID employees to comply with rules of the TDCJ-ID Inmate Visitation Policy [AD-03.85].

253. The DRC did not respond to that particular complaint.

254. On 17 August 1997, Warden Moore denied plaintiff's administrative grievance, stating:

> "Visitation is a privilege. In as much it is the Warden discretion to deny anyone on your list. Grievance denied."

255. On 12 August 1997, plaintiff appealed the decision of Warden Moore to the Regional Director.

256. On 20 October 1997, the Regional Director, Mr. Warren, responded to the appeal, stating:

> "Appeal denied. Investigation reveals the warden chose to deny this visitor as possible security risk. This denial was reviewed by the Director Review Committee and the denial was upheld. As you were advised, visitation is a privilege and the warden can deny a visitor which is considered to be a possible security risk."

257. Plaintiff asserts, prior to the removal of Andrea from the Visitors List, she had visited plaintiff almost 2½ years, for every weekend at the Coffield Unit, without any incident(s) or rule infraction(s).

258. In conjunction with weekly visits, plaintiff and Andrea actively participated in the marriage/family and parenting seminars, and Mothers' Day events, sponsored by the Coffield Unit Chapel in affiliation with free-world religious organizations.

259. Each of these events were held inside the Coffield Unit Education Department, Unit Chapel and/or Unit Dining Room.

260. At no time during these events did plaintiff or Andrea present a threat or any indication their participation or weekly visits on the unit could result in a possible security risk.

261.  There is no evidence to support the Coffield Unit or the ORC's arbitrary and conspicuous allegations in response to a legitimate appeal.

262.  On 05 November 1997, the SOC transferred plaintiff to the TDCJ-ID Ellis Unit in Huntsville, Texas.

263.  The Ellis Unit Classification Committee consisted of Ms. Maxey, Capt. Spivey and Maj. Brook.

264.  Plaintiff entered the office for unit classification and Maj. Brook was in the motion of tendering a document to Capt. Spivey and Ms. Maxey.  The document was from among the papers in plaintiff's unit classification folder.

265.  On information and belief, the document was from the Coffield Unit administration bearing negative and discriminatory contents to bias the evaluation of plaintiff on unit assignments.

266.  In light of the document, Maj. Brook declined to honor plaintiff's job assignment status as SSI and restricted plaintiff to cellblock housing restriction.[30]

267.  Maj. Brook arbitrarily declared plaintiff had medical restrictions which barred the SSI job assignment.

268.  On or about 29 December 1997, plaintiff confronted the former senior warden, Bruce Thaler, about replacing Andrea on the Visitors List.

269.  Warden Thaler instructed plaintiff to get a copy of the Visitation form from the Records Office and submit it to the Unit

---

30).  The Ellis  Unit consist of cellblock and dormitory housing. Plaintiff's restriction to cellblock housing "ONLY" is contrary to any previous unit classification status.

Classification Committee, Ms. Maxey.

270.  Plaintiff complied and hand-delivered the form to Ms. Maxey.

271.  On 31 November 1997, Andrea's name was replaced on the Visitors List as "FRIEND."

272.  On or about 31 December 1997, a "NOTICE TO OFFENDERS" was posted in the Ellis Unit hallway.

273.  The notice referred to an alleged copy of the original bulletin to amend the Inmate Visitation Policy [AD-03.85].

274.  On or about 03 January 1998, in receipt of a copy of the Visitors List with Andrea as "FRIEND", plaintiff forwarded the copy to Andrea via U.S. Mail with a written notification.

275.  On 09 January 1998, in a phone conversation, plaintiff instructed Andrea to disregard the visiting status, but, before travelling to visit, contact the Ellis Unit administrationes for clearance.

276.  On 10 January 1998, in a phone conversation with the Ellis Unit administration, Capt. Spivey instructed Andrea it was approved for her to visit plaintiff.

277.  On 11 January 1998, during the regularly scheduled hours for visitation (8AM to 5PM/Saturdays and Sundays), Andrea arrived at the Ellis Unit to visit plaintiff.

278.  At the checkpoint of entry to the Ellis Unit compound, the correctional officer-in-charge informed Andrea Capt. Spivey denied her visit with plaintiff.

279.  Andrea travelled over 130 miles for a visit and a verbal request to talk to a warden or someone above the rank of

captain was to no avail.

280.   The officer-in-charge provided Andrea with a copy of the latest "Modified Visitation Policy Current/Former Employees" bearing the signature of Warden Staples.

281.   Plaintiff awaited the arrival of Andrea without any notification of a denied visit.

282.   On 12 January 1998, Andrea contacted the Ellis Unit administration and was assured Warden Staples was meeting with the other assistant warden and the senior warden to discuss the matter.

283.   On 12 January 1998, plaintiff was provided a written notice from Capt. Spivey denying Andrea's visit, and a copy of the Visitors List from Ms. Maxey with Andrea's name deleted.

284.   In a conversation with Ms. Maxey and the former senior warden, Bruce Thaler, plaintiff was instructed to resubmit a Visitation Request form in six(6) months for changes to have Andrea replaced on the Visitors List.

285.   On 09 July 1998, per Bruce Thaler, plaintiff requested from the Records Office a copy of the Visitation Approval Form For Current/Former TDCJ Employees.  (There was no reply!)

286.   On 29 July 1998, plaintiff was informed by the Office of Unit Classification to request a copy of the AO-2 Form (the Visitation Approval Form For Current/Former TDCJ Employees) from Ms. Moore at Inmate Records.

287.   In response, Ms. Moore stated:

> "We do not have any AO-2 Form.  There is a place on the
> AO-1 (Visitation Form)  to check if the person is a former
> TDCJ Emp."

288. On 10 August 1998, plaintiff submitted a visitation change request to add relatives and Andrea to the Visitors List.

289. On 17 August 1998, plaintiff received a copy of the approved Visitors List from D. Downs with a note, stating:

> "Andrea Jeffery can not be added to your list per your family history."

290. On 02 September 1998, plaintiff submitted his second administrative grievance to challenge the denial of replacing Andrea on the Visitors List.

291. On 04 September 1998, Andrea submitted her second and emotional correspondence to the DRC for her name to be replaced on the Visitors List.

292. On 23 September 1998, plaintiff's grievance was denied by Warden Williamson stating:

> "You have violated the grievance procedure by exceeding established time limits for filing. Said procedure clearly states you must file your grievance within 15 days of the alleged incident. Based upon the stated violation no further action will be taken by this office."

293. On 28 September 1998, plaintiff appealed the decision of Warden Williamson to the Regional Director.

294. On 13 October 1998, in "Review of Reappeal For Former/ Current TDCJ Employee Requesting To Visit," Mr. Johnson denied the approval for Andrea on the Visitors List.

295. On 14 October 1998, in response to Andrea's second correspondence, the DRC stated:

> "Dear Mrs. Jeffery;
>
> May this acknowledge receipt of your correspondence to the Director's Review Committee (DRC) requesting visitation privileges be reinstated with offender Eddie Ray Jeffery, TDCJ-ID# 376862, Ellis Unit.
> Each committee member and Division Director read your

letter. However, after careful perusal and deliberation, it was the decision of the Division Director and this committee to not grant your request; your name will not be added to the list of approved visitors for offender Jeffery. This decision may be appealed after six months have expired."

295. On 21 October 1998, in response to plaintiff's appeal, the Regional Director, Mr. Lewis stated:

"The remedy you request is not available to you through the grievance procedure. Contact unit officials informally for help. No action will be taken by this office."

297. On 30 October 1998, plaintiff hand-delivered to Unit Classification Committee, Ms. Maxey, the original grievance and appeal bearing the response from Mr. Lewis, along with an inmate request to appear before the Unit Classification Committee for informal resolution.

298. On or about 11 March 1999, in light of the response from Mr. Lewis, Warden Morgan insured plaintiff the situation could be informally resolved.

299. Warden Morgan instructed plaintiff to forward the response from Mr. Lewis to his (Warden Morgan) office.

300. On 15 March 1999, plaintiff confronted Ms. Maxey and demanded a return of the grievances[31] in order to forward same to Warden Morgan.

301. On 15 March 1999, plaintiff submitted the grievances to Warden Morgan, with a written correspondence in reference to Mr. Lewis' direction for unit officials informal help.

302. On or about 18 March 1999, in return of the grievances

---

31). Ms. Maxey held possession of the grievances for almost five(5) months (October 30, 1998, to March 15, 1999) without any response, or action for informal resolution.

and correspondence for Warden Morgan, Assistant Warden Heuszel
simply stated:

"Request denied."

303. Plaintiff approached Warden Morgan in the main hallway
and referred to Warden Heuszel's refusal to replace Andrea on the
Visitors List.

304. Warden Morgan politely informed plaintiff the matter
was turned over to Warden Heuszel, and instructed plaintiff to
"Get with Warden Heuszel."

305. On or about 01 April 1999, plaintiff was called for an
interview with Warden Heuszel.

306. The interview was actioned at the unit classification
office, in the presence of a building major and Capt. Spivey.

307. Warden Heuszel stated that he (Warden Heuszel) and
Warden Morgan had agreed to replace Andrea on the Visitors List
for "non-contact visitation."

308. Plaintiff was instructed to send Warden Heuszel a
visitation change request to replace Andrea on the Visitors List.

309. On 01 April 1999, plaintiff submitted the visitation
change request to Warden Heuszel along with an Inmate Request per
his (Warden Heuszel) instructions.

310. In a correspondence to Andrea, plaintiff explained the
agreement of Warden Heuszel and Warden Morgan to replace her on
the Visitors List.

311. However, contrary to the decision of Warden Morgan,
Andrea was not replaced on the Visitors List.

312. On 04 May 1999, plaintiff was reclassified for Support

Service (SSI) Clerk.[32]

313. At the time, Warden Heuszel was acting chairman for the unit classification committee.

314. The unit classification committee approved plaintiff for SSI Clerk and plaintiff inquired of Warden Heuszel the reason Andrea was not replaced on the Visitors List.

315. Warden Heuszel stated that he (Warden Heuszel) could not find any record of plaintiff and Andrea's marriage status.

316. Plaintiff informed Warden Heuszel there were documents in his (plaintiff) unit and central classification files in full compliance with the Inmate Visitation Policy [AD.03.85].

317. In addition, plaintiff informed Warden Heuszel there were copies of those documents in plaintiff's possession.

318. Warden Heuszel arrogantly replied, "Well, I didn't see anything!" and dismissed plaintiff.

319. At the time, over six(6) months had elapsed since the DRC denied Andrea's request for reinstatement on the Visitors List.

320. Andrea submitted her fourth correspondence to the DRC requesting visitation be reinstated with plaintiff.

_____

32). SSI Clerk is a Support Service Inmate approved by the Unit Classification Committee to perform clerical tasks involving non-sensitive unit records. The SSI Clerk provide typing, filing, and other related services for staff members in an environment which contains sensitive information kept inaccessible from all inmates. Typing and filing must be performed under direct supervision of a staff member. If no supervision is possible. . .the site should be secured. . . (V.T.C.A. Government Code, § 500.001; Paragraph III(A), Ruiz Final Judgement; TDCJ Administrative Directive [AD-04.72 (Rev.1)(June 26, 1995)]).

321. On 07 July 1999, in response to the correspondence, the DRC stated:

"Dear Mrs. Jeffery;

Your correspondence requesting visitation privileges be re-instated with offender Eddie Jeffery, TDCJ-ID# 376862, Ellis Unit has been received and reviewed by the Director's Review Committee (DRC).

Current/Former employees are not allowed to be placed on an offender's visiting list for a period of 24 months from the date of the employee's separation from the Agency unless:

1. The relationship was established prior to the offender's incarceration; and

2. While employed with the TDCJ-ID, the current/former employee reported the relationship to Agency officials in accordance with PD-21, "Employee General Rules of Conduct;" and

3. The current/former employee is spouse, child, sister/brother, sister-in-law/brother-in-law, mother/father, mother-in-law/father-in-law, or grandmother/grandfather of the offender.

After expiration of the 24 month period, the former employee may request reinstatement of visitation privileges through DRC and concurrently, it is the offender's responsibility to request the former employee be added to his visitation list by submitting an PD-2 form through the Warden to DRC. A former employee name cannot be reinstated to an offender's visitation list without the offender's submission of an PD-2 form. Be advised that documented security concerns (for example, delivery or attempted delivery of contraband to the offender while still an employee) may be the cause for disapproval of the request.

Our records indicate that you are eligible for consideration to receive visitation privileges because you have been separated from the Agency for 24 months. Each committee member read your letter. However, after careful perusal and deliberation, it was the decision of the committee, with the approval of the unit warden, to not grant your request; your name will not be added to the list of approved visitors for offender Jeffery.

This decision may be appealed after six months have expired; and you may request to be reinstated to offender Jeffery's visitation list and offender Jeffery must submit an PD-2 form."

322.   Plaintiff asserts the information provided by the ORC, in reference to current/former TDCJ-ID employees was [partially] added to the revised Inmate Visitation Policy [AD.03-85] and effective 20 November 1997.

323.   Andrea has been separated from the TDCJ-ID for nine(9) years and, at no time, during her tenure with the TDCJ-ID were she and plaintiff involved in any acts of illicit behavior or misactions.

324.   In order to substantiate the fact that plaintiff and Andrea were not involved in actions contrary to the TDCJ policy, plaintiff filed a formal complaint with the IAD for investigation and polygraph examination.   (The IAD failed to respond to the complaint).

325.   To this date, there has been no "specific reason(s)" for the removal of Andrea from the Visitors List.

326.   The 20 November 1997 "Notice to Offenders" contradicts the "Modified Visitation Policy Current/Former Employees" handed down by the director of the TDCJ-ID.[33]

327.   The TDCJ-ID inmates have not been notified by bulletin or any other means of the revised visitation policy pertaining to the 07 July 1999 BOC correspondence/response to Andrea.

328.   Plaintiff maintains that prior to being removed from the Visitors List, before the changes in the Inmate Visitation

_____

33).   Plaintiff does not have access to copies of the notice, revised or modified Inmate Visitation Policy since 20 November 1997.   However, plaintiff shall seek production of these documents, by motion for  disclosure for benefit of this Court.

Policy, Andres visited plaintiff weekly without rule infractions.

329.  On information and belief the defendants executed a personal attack on the marriage of plaintiff and Andres.

330.  According to the TDCJ-ID, the primary objective of the Inmate Visitation Policy is set forth on the front page of the AD-03.85 (Rev.2), stating:

"SUBJECT: INMATE VISITATION

AUTHORITY: Section 500.010, 500.011 and 500.012, Government Code; Section 20.02(d), Texas Penal Code; The Stipulation Modifying Crowding Provisions of Amended Decree, (Section VII.), Ruiz v. Lynaugh, Civil Action No. H-78-987-CA, May, 1985 . . .

PURPOSE: To establish uniform policies and procedures for the implementation of the inmate visitation program.

POLICY: It is the policy of the Institutional Division of Texas Department of Criminal Justice (TDCJ-ID) *to enable and encourage inmates, consistent with security and classification restraints, to have visits with family members and friends.* Visiting in the Institutional Division shall be conducted in an accommodating manner, in keeping with needs to maintain order, the safety of persons and the security of the institution. Inmate visitation shall be conducted in accordance with provisions of this Administrative Directive and under the direction of each Unit Warden.

DISCUSSION: This Administrative Directive is being issued for the purpose of establishing a uniform inmate visitation policy for the Department, as required by Section 500.010 (as added by Section 35 of Senate Bill 245, 70th Legislature 1987), and in accordance with the provisions of the Ruiz Crowding Stipulation. . . .*Visitation is recognized as an integral component of the rehabilitation process, and, as such, its process is established in this Administrative Directive to follow the least restrictive protocol as possible.* This facilitates a positive and meaningful environment for visitation. Contact visitation is recognized as a privilege, in that, inmates approved for contact visits may be temporarily restricted from contact visitaion due to violation of institutional rules. . . ." (italics plaintiff)

331.  The modified visitation policy and its subsequent changes does not have a holding clause as being retroactively applicable to inmates prior to 20 November 1997.

332.  The defendants have acted deliberately and maliciously contrary to the TDCJ-ID Inmate Visitation Policy, in respect to inmate "visitation as an integal component of the rehabilitation process."

333.  On information and belief, there exist an [un]written TDCJ-ID policy for its employees to protect each other in any situation involving the integrity of their employment and/or the TDCJ-ID agency.

334.  The defendants have acted deliberately and maliciously in a conspiracy to cover-up discriminatory behavior and personal bias with a wanton and unnecessary infliction of pain that serves no legitimate penalogical objective(s).

335.  On information and belief, the defendants promote and condone acts of racial, sex and employment discrimination, as it is practiced throughout the TDCJ-ID inmate population, ranking of the TDCJ correctional staff and other employees.

336.  The discriminatory act of each defendant is designed to deprive plaintiff the equal protection of the laws, or equal privileges and immunities under the laws, and produce a hostile environment and influence in the agency.

337.  The discriminatory behavior of each defendant is an act of cruel and unusual punishment to inflict mental anguish and distress.

338.  As a result of the defendants' conduct and behavior, plaintiff has lost focus and been denied an "integal component of the rehabilitation process" to reform and reconstruct his life and behavior for the benefit to serve in a free society.

339.  On 02 August 1999, following the DRC's denial of being replaced on plaintiff's Visitors List, Andrea filed a petition for divorce against plaintiff.

340.  The petition for divorce was the ultimate result of the defendants arbitrary and discriminatory conduct, in their denial of Andrea to visit plaintiff.

**CLAIMS FOR RELIEF:**

341.  The actions of each defendant member of the SOC, in their retaliatory transfers of plaintiff and periodical removal of Andrea from the Visitors List without reason, incident or TDCJ-ID rule infraction, were done conspiringly with a racial, malicious and sadistic intent to deprive equal protection of the laws, or equal privileges and immunities under the laws, and constituted a denial to freedom of association, cruel and unusual punishment to inflict mental anguish and discrimination, in violation of the First, Eighth and Fourteenth Amendments to the United States Constitution.

342.  The actions of each defendant member of the SOC, in their arbitrary denial of plaintiff a four-year college transfer from 1991 to 1997, for being interracial married to a former TDCJ employee, or without any other reason or penalogical objective, were done conspiringly with a racial, malicious and sadistic intent to deprive the equal protection of the laws, or equal privileges and immunities under the laws, and constituted denial to freedom of association, cruel and unusual punishment to inflict mental anguish and discrimination, in violation the First, Eighth and Fourteenth Amendments to the United States

Constitution.

343. The actions of each defendant member of BOC, in their arbitrary denial of plaintiff to use federal funds (Pell Grants) to finance college programs for being interracial married to a former TDCJ employee, or without any other reason or penalogical objective were done conspiringly with a racial, malicious and sadistic intent to deprive the equal protection of the laws, or equal privileges and immunities under the laws, and constituted denial to freedom of association, cruel and unusual punishment to inflict mental anguish and discrimination, in violation the First, Eighth and Fourteenth Amendments to the United States Constitution.

344. The conduct of each defendant member of the BOC constituted acts of discrimination in denial of equal protection of the laws, or equal privileges and immunities under state law.

345. The failure of defendants Brickham and McAuliffe to intervene or take steps to curb the discriminatory conduct of the defendant members of BOC contributed to and proximate caused the violation of plaintiff's rights under the First, Eight and Fourteenth Amendments to the United States Constitution.

346. The actions of defendants Vernon, C. Johnson, Smith and Upshaw, in their denial of plaintiff's visits and removal of Andrea from the Visitors List, without reason, incident or TDCJ rule infraction, were done conspiringly with a racial, malicious and sadistic intent to deprive equal protection of the laws, or equal privileges and immunities under the laws, and constituted denial to freedom of association, cruel and unusual punishment to

inflict mental anguish and discrimination, in violation of the First, Eighth and Fourteenth Amendments to the United States Constitution.

347. The conduct of defendants Vernon, C. Johnson, Smith and Upshaw constituted acts of discrimination in denial of equal protection of the laws, or equal privileges and immunities under state law.

348. The failure of defendants Mays and White to intervene or take steps to curb the discriminatory conduct of defendants Vernon, C. Johnson, Smith and Upshaw, contributed to and proximately caused the violation of plaintiff's rights under the First, Eight and Fourteenth Amendments to the United States Constitution.

349. The failure of defendants Moore and Warren, in their refusal to overturn the arbitrary decision of defendants Vernon, C.Johnson, Smith and Upshaw, to remove Andrea from the Visitors List further denied plaintiff's rights under the First, Eighth and Fourteenth Amendments to the United States Constitution.

350. The action of defendant Thompson, in reassignment of plaintiff's job for being interracial married to a former TDCJ employee was done with a racial, malicious and sadistic intent to deprive the equal protection of the laws, or equal privileges and immunities under the laws, and infringed on the rights to freedom of association, cruel and unusual punishment to inflict mental anguish and discrimination, in violation of the First, Eighth and Fourteenth Amendments to the United States Constitution.

351. The conduct of defendant Thompson constitute an act of

discrimination in denial of the  equal protection  of the laws, or equal privileges and immunities under state law.

352.  The actions of defendants Maxey, Brock and Spivey, in their classification of plaintiff to a discriminatory prison environment, for being interracial married  to a former TDCJ-ID employee,  were  done conspiringly with  a racial,  malicious and sadistic  intent to deprive  the equal protection of  the laws, or equal  privileges and  immunities under the  laws, and constituted cruel and  unusual  punishment  to  inflict  mental  anguish and discrimination,  in violation of the  First, Eighth and Fourteenth Amendments to the United States Constitution.

353.  The  conduct  of  defendants  Maxey,  Brock and  Spivey constituted acts  of discrimination, in denial of equal protection of the laws, or equal privileges and immunities under state law.

354.  The action of defendant Spivey,  in denying plaintiff to visit was done  with a racial, malicious and sadistic intent to deprive the equal protection  of the laws, or equal privileges and immunities under the  laws, and constituted a denial to freedom of association,  cruel  and  unusual  punishment  to  inflict  mental anguish and  discrimination,  in violation of  the First,  Eighth and Fourteenth Amendments to the United States Constitution.

355.  The conduct  of defendant  Spivey constituted an act of discrimination in  denial of the  equal protection of the laws, or equal privileges and immunities under state law.

356.  The  actions of defendants  Spivey, Maxey  and Staples, in their removal of Andrea from  the Visitors List without reason, incident or  TDCJ-ID rule infraction,  were  done conspiringly with

a racial, malicious and sadistic intent to deprive the equal protection of the laws, or equal privileges and immunities under the laws, and constituted a denial to freedom of association, cruel and unusual punishment to inflict mental anguish and discrimination, in violation of the First, Eighth and Fourteenth Amendments to the United States Constitution.

357.  The conduct of defendants Spivey, Maxey and Staples constituted acts of discrimination, in denial of equal protection of the laws, or equal privileges and immunities under state law.

358.  The failure of defendants Williamson and Lewis, in their refusal to overturn the arbitrary decision of defendants Spivey, Maxey and Staples to cancel plaintiff's visits and remove Andrea from the Visitors List, further denied plaintiff's rights under the First, Eighth and Fourteenth Amendments to the United States Constitution.

359.  The failure of defendants Maxey, Heuszel and Morgan to take action for informal resolution of plaintiff's grievances and appeals further denied plaintiff's rights under the First, Eight and Fourteenth Amendments to the United States Constitution.

360.  The overall and consistent actions of each defendant member of the DRC and defendant G. Johnson, in their refusal to overturn the bias and arbitrary removal of Andrea from the Visitors List, were done conspiringly with a racial, malicious and sadistic intent to deprive equal protection of the laws, or equal privileges and immunities under the laws, and constituted denial to freedom of association, cruel and unusual punishment to inflict mental anguish and discrimination, in violation of the

First, Eighth and Fourteenth Amendments to the United States Constitution.

361. The overall and consistent conduct of each defendant member of the DRC and defendant G. Johnson, constituted acts of discrimination, in denial of the equal protection of the laws, or equal privileges and immunities under state law.

**RELIEF REQUESTED:**

WHEREFORE, plaintiff requests that the Court grant the following relief:

    A.  Issue a declaratory judgement stating that:

        1). The mental sufferings of plaintiff by defendants Vernon, C. Johnson, Smith, Upshaw, Thompson, Spivey, Maxey, Brock, Staples and each member of the BOC, violated plaintiff's rights under the First, Eighth and Fourteenth Amendments to the United States Constitution, and constituted discrimination under state laws.

        2). The defendants Brickham, McAuliffe, White, Mays, Heuszel and Morgan failure to intervene or take action to curb the discriminatory actions of each defendant member of the BOC and defendants Vernon, C. Johnson, Smith, Upshaw, Thompson, Spivey, Maxey, Brock and Staples, violated plaintiff's rights under the First, Eighth and Fourteenth Amendments to the United States Constitution, and constituted discrimination under state laws.

        3). The actions of defendants Brickham, Moore and

Williamson, in their conduct of plaintiff's grievances and complaints; and, each defendant member of the ORC and defendants Warren, Lewis and G. Johnson, in their conduct of sustaining the grievances and complaints violated plaintiff's rights under the First, Eighth and Fourteenth Amendments to the United States Constitution.

4). The defendants Maxey, Spivey and Staples actions, in their denial of Andrea to visit plaintiff, violated and continued to violate plaintiff's rights under the First, Eighth and Fourteenth Amendments to the United States Constitution.

B. Issue an injunction ORDERING the defendants Morgan, G. Johnson and each defendant member of the ORC and the BOC to:

1). Immediately arrange for Andrea to visit plaintiff according to the TDCJ-ID Visitation Policy [AD-03.85], effective when plaintiff and Andrea filed papers to acknowledged their common-law marriage, in order for plaintiff and Andrea to reconcile their relationship.

2). Immediately arrange the transfer of plaintiff to a TDCJ-ID unit with a four-year college program, in any event that the defendants feel or assume Andrea's visits on the TDCJ-ID Ellis Unit would constitute a risk or security factor.

3). Carry out without delay the request for plaintiff to enroll in the four-year college program without any financial obligations, restrictions or limitations.

4). Expunge from plaintiff's TDCJ-ID unit and central files all the false and negative information alleged in this complaint.

C. Award compensatory damages in the following amounts:

1). $500,000 jointly and severly against each of the defendant members of BOC for the emotional injuries plaintiff sustained, as a result of harassment and the retaliatory transfers to force Andrea to travel across the State of Texas to visit and the removal of Andrea from plaintiff's Visitors List.

2). $500,000 jointly and severely against each of the defendant members of BOC for the emotional injuries plaintiff sustained, as a result of being denied to participate in the four-year college program from 1991 to 1997.

3). $100,000 jointly and severely against each of the defendant members of the BOC for college tuition, as a result of plaintiff being denied use of federal grants from 1991 to the ban on such grants for prisoners.

4). $500,000 jointly and severely against defendants Brickham and McAuliffe for the emotional injuries plaintiff sustained, as a result of their failure to intervene or take steps to curb the actions of each defendant member of the BOC.

5). $500,000 jointly and severely against defendants Vernon, C. Johnson, Smith and Upshaw for the emotional injuries plaintiff sustained, as a result of their

denial of Andrea to visit plaintiff and the removal of Andrea from plaintiff's Visitors List.

6). $500,000 jointly and severely against defendants Maye and White for the emotional injuries plaintiff sustained, as a result of their failure to intervene or take steps to curb the actions of defendants Vernon, C. Johnson, Smith and Upshaw.

7). $500,000 jointly and severely against defendants Moore and Warren for the emotional injuries plaintiff sustained, as a result of their failure to overturn the decision of defendants Vernon, C. Johnson, Smith and Upshaw to remove Andrea from plaintiff's Visitors List.

8). $500,000 jointly and severely against defendants Thompson, Maxey, Brook and Spivey for discriminatory classification and assignment of plaintiff for being married to a former TOCJ-ID employee.

9). $500,000 jointly and severely against defendants Spivey, Maxey and Staples for the emotional injuries plaintiff sustained, as a result of their denial of Andrea to visit plaintiff.

10). $500,000 jointly and severely against defendants Williamson and Lewis for emotional injuries plaintiff sustained, as a result of their failure to overturn the decision of defendants Spivey, Maxey and Staples to deny Andrea to visit plaintiff.

11). $500,000 jointly and severely against defendants

Maxey, Heuszel and Morgan for the emotional injuries plaintiff sustained, as a result of their failure to informally resolve the arbitrary removal of Andrea from plaintiff's Visitors List.

12). $500,000 jointly and severely against each of the defendant members of the DRC and defendant G. Johnson for the emotional injuries plaintiff sustained, as a result of their overall and consistent denials to replace Andrea on plaintiff's Visitor's List.

D.  Award punitive damages in the following amounts:

1).  $200,000 against each defendant member of the BOC, and defendants Brickham and McAuliffe.

2).  $100,000 against each defendant member of the DRC, and defendants Vernon, C. Johnson, Smith, Upshaw, Mays, White, Moore, Warren, Thompson, Maxey, Brook, Spivey, Staples, Williamson, Lewis, Heuszel, Morgan and C. Johnson.

E.  Invoke state law which requires termination of TOCJ employees for the acts described herein.

F.  Grant such other relief as it may appear the plaintiff is entitled.

Respectfully submitted,

_Eddie Ray Jeffery_
Eddie Ray Jeffery
Plaintiff

Executed on this __28th__ day of MARCH, 2000.

## PLAINTIFF'S DECLARATION:

1. I declare under penalty of perjury that all the facts presented in this complaint and attachments hereto are true and correct.

2. I understand that if I am released or transferred, it is my responsibility to keep the Court informed of current mailing address and failure to do so may result in the dismissal of this lawsuit.

3. I understand that I must exhaust all administrative remedies available, prior to filing this lawsuit.

4. I understand that I am prohibited from bringing an in forma pauperis lawsuit if I have brought three or more civil actions in a Court of the United States while incarcerated or detained in any facility, which lawsuits were dismissed on the ground they were frivolous, malicious, or failed to state a claim upon upon which relief may be granted unless, I am under imminent danger of serious physical injury.

5. I understand that if I am allowed to proceed without any prepayment of costs, I am responsible for the $150 filing fee and the costs assessed by the Court, which shall be deducted in accordance with the law from my inmate account by my custodian until the filing fee is paid.

Signed on this 28th day of MARCH, 2000.

Eddie Ray Jeffery
_____
Plaintiff